UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| SAM BURNETT,<br><br>Plaintiff,<br><br>v.<br><br>SOCIAL SECURITY ADMINISTRATION,<br><br>Defendant. | Case No. 2:19-cv-00082<br><br>Chief Judge Waverly D. Crenshaw, Jr.<br>Magistrate Judge Alistair E. Newbern |

To: The Honorable Waverly D. Crenshaw, Jr., Chief District Judge

**REPORT AND RECOMMENDATION**

Plaintiff Sam Burnett filed this action under 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Commissioner of the Social Security Administration (SSA) denying his applications for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–34, 1381–85. (Doc. No. 1.) The Court referred this action to the Magistrate Judge to dispose or recommend disposition of any pretrial motions under 28 U.S.C. § 636(b)(1)(A) and (B). (Doc. No. 7.) Before the Court is Burnett's motion for judgment on the administrative record (Doc. No. 19), to which the Commissioner has responded in opposition (Doc. No. 22). Having considered these filings and the administrative record as a whole, and for the reasons that follow, the Magistrate Judge will recommend that Burnett's motion be granted, the ALJ's decision be vacated, and this case be remanded for further administrative proceedings and rehearing consistent with this Report and Recommendation.

## I. Background

### A. Burnett's DIB and SSI Applications

Burnett applied for DIB and SSI on January 17, 2017, alleging that he has been disabled and unable to work since August 1, 2016, as a result of post traumatic stress disorder (PTSD), major depression, sleep apnea, spinal stenosis, sciatica, anxiety, meralgia paresthetica, high blood pressure, high cholesterol, heart problems, and anemia. (AR 76, 90.[1]) The Commissioner denied Burnett's applications initially and on reconsideration. (AR 103, 104, 141, 142.) At Burnett's request, an administrative law judge (ALJ) held a hearing on June 14, 2018. (AR 38–74, 160–62.) Burnett appeared with counsel and testified. (AR 40–67.) The ALJ also heard testimony from a vocational expert. (AR 67–73.)

### B. The ALJ's Findings

On September 27, 2018, the ALJ issued a written decision finding that Burnett was not disabled within the meaning of the Social Security Act and applicable regulations and denying his claims for DIB and SSI. (AR 15–31.) The ALJ made the following enumerated findings:

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2021 (Ex. 8D at 1).
>
> 2. The claimant has not engaged in substantial gainful activity since August 1, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> * * *
>
> 3. The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, sleep apnea, essential hypertension, congenital heart disease, peripheral neuropathy, obesity, anxiety, depression, attention deficit hyperactivity disorder (ADHD), and post-traumatic stress disorder (PTSD) (20 CFR 404.1520(c) and 416.920(c)).

[1] The Transcript of the Administrative Record (Doc. No. 16) is referenced herein by the abbreviation "AR." All page numbers cited in the AR refer to the Bates stamp at the bottom right corner of each page.

*     *     *

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

*     *     *

5.     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) in that the claimant can lift and/or carry 20 pounds occasionally and 10 pounds frequently. He can stand and/or walk, with normal breaks, for a total of 6 hours per 8-hour workday, and can sit, with normal breaks, for a total of 6 hours per 8-hour workday. In terms of postural limitations, he can frequently climb ramp[s] and stairs, balance, kneel, crouch, and crawl. He can occasionally stoop and climb ladders, ropes, and scaffolds. He must be permitted to alternate between sitting and standing at 60-minute intervals for 5 minutes, while remaining at the workstation and on task. In terms of mental limitations, he can understand and remember simple and detailed instructions but cannot make independent decisions at an executive level. He cannot interact with the general public but he can have occasional interactions with co-workers and supervisors. He can adapt to infrequent change in a routine work setting.

*     *     *

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

*     *     *

7.     The claimant was born on April 13, 1965 and was 51 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963) (Ex. 8D at 1).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964) (Ex. 4E at 1, 3).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

*          *          *

> 11. The claimant has not been under a disability, as defined in the Social Security Act, from August 1, 2016, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(AR 17–31.) The Social Security Appeals Council denied Burnett's request for review on August 27, 2019, making the ALJ's decision the final decision of the Commissioner. (AR 1–6.)

### C. Appeal Under 42 U.S.C. § 405(g)

Burnett filed this action for review of the ALJ's decision on October 25, 2019 (Doc. No. 1), and this Court has jurisdiction under 42 U.S.C. § 405(g). Burnett argues that the ALJ violated SSA regulations by failing to provide good reasons for discrediting Dr. Stacey Carlton's medical opinions, giving more weight to non-examining and non-treating medical sources, and improperly evaluating Burnett's subjective complaints. (Doc. No. 20.) The Commissioner argues that the ALJ's decision is supported by substantial record evidence. (Doc. No. 22.) Burnett did not file an optional reply.

### D. Review of the Record

The ALJ and the parties have thoroughly described and discussed the medical and testimonial evidence in the administrative record. Accordingly, the Court will discuss those matters only to the extent necessary to analyze the parties' arguments.

## II. Legal Standards

### A. Standard of Review

This Court's review of an ALJ's decision is limited to determining (1) whether the ALJ's findings are supported by substantial evidence and (2) whether the ALJ applied the correct legal standards. *See* 42 U.S.C. § 405(g); *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016) (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405–06 (6th Cir. 2009)). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether

it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (alteration in original) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is less than a preponderance but "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*; *see also Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014) (same). Further, "[t]he Social Security Administration has established rules for how an ALJ must evaluate a disability claim and has made promises to disability applicants as to how their claims and medical evidence will be reviewed." *Gentry*, 741 F.3d at 723. Where an ALJ fails to follow those rules or regulations, "we find a lack of substantial evidence, 'even where the conclusion of the ALJ may be justified based upon the record.'" *Miller*, 811 F.3d at 833 (quoting *Gentry*, 741 F.3d at 722).

**B. Determining Disability at the Administrative Level**

DIB and SSI benefits are available to individuals who are disabled, which is defined in this context as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (explaining that this definition applies in the DIB and SSI contexts).

ALJs must employ a "five-step sequential evaluation process" to determine whether a claimant is disabled, proceeding through each step until a determination can be reached. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). For purposes of this case, the regulations governing disability determination for DIB and SSI benefits are identical. *See Colvin*, 475 F.3d at 730 (citing 20 C.F.R. §§ 404.1520, 416.920). At step one, the ALJ considers the claimant's work activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). "[I]f the claimant is performing substantial gainful

activity, then the claimant is not disabled." *Miller*, 811 F.3d at 834 n.6. At step two, the ALJ determines whether the claimant suffers from "a severe medically determinable physical or mental impairment" or "combination of impairments" that meets the 12-month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). "If the claimant does not have a severe impairment or combination of impairments [that meets the durational requirement], then the claimant is not disabled." *Miller*, 811 F.3d at 834 n.6. At step three, the ALJ considers whether the claimant's medical impairment or impairments appear on a list maintained by the Social Security Administration that "identifies and defines impairments that are of sufficient severity as to prevent any gainful activity." *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); *see* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "If the claimant's impairment meets or equals one of the listings, then the ALJ will find the claimant disabled." *Miller*, 811 F.3d at 834 n.6. If not, the ALJ proceeds to step four. *Combs*, 459 F.3d at 643; *see also Walker v. Berryhill*, No. 3:17-1231, 2017 WL 6492621, at *3 (M.D. Tenn. Dec. 19, 2017) (explaining that "[a] claimant is not required to show the existence of a listed impairment in order to be found disabled, but such showing results in an automatic finding of disability and ends the inquiry"), *report and recommendation adopted by* 2018 WL 305748 (M.D. Tenn. Jan. 5, 2018).

At step four, the ALJ evaluates the claimant's past relevant work and "'residual functional capacity,' defined as 'the most [the claimant] can still do despite [his] limitations.'" *Combs*, 459 F.3d at 643 (first alteration in original) (quoting 20 C.F.R. § 404.1545(a)(1)); *see* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Past work is relevant to this analysis if the claimant performed the work within the past 15 years, the work qualifies as substantial gainful activity, and the work lasted long enough for the claimant to learn how to do it. 20 C.F.R. §§ 404.1560(b), 416.960(b). If the claimant's residual functional capacity (RFC) permits him to perform past

relevant work, he is not disabled. *Combs*, 459 F.3d at 643. If a claimant cannot perform past relevant work, the ALJ proceeds to step five and determines whether, "in light of his residual functional capacity, age, education, and work experience," a claimant can perform other substantial gainful employment. *Id.* While the claimant bears the burden of proof during the first four steps, at step five the burden shifts to the Commissioner to "identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity and vocational profile." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011). "Claimants who can perform such work are not disabled." *Combs*, 459 F.3d at 643; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

## III. Analysis

Burnett's primary argument in support of judgment on the administrative record is that the ALJ violated the treating physician rule by failing to give good reasons for discounting Dr. Carlton's opinions about Burnett's mental health, including her opinion that a full-time employment setting would exacerbate Burnett's anxiety—which is closely tied to performance and social issues—triggering panic attacks lasting for hours and depressive cycles lasting three to five days. (Doc. No. 20.) Burnett also argues that the ALJ violated SSA regulations by giving more weight to the opinions of non-treating and non-examining sources and by improperly discounting Burnett's subjective complaints. (*Id.*) The Commissioner argues that the ALJ's decision is supported by substantial evidence. (Doc. No. 22.)

### A. The ALJ's Consideration of Dr. Carlton's Opinions

#### 1. The Treating Physician Rule

The SSA has promised DIB and SSI claimants that it "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence" and, "[r]egardless of its source, . . . will evaluate every medical opinion [it] receive[s]." 20 C.F.R. §§ 404.1527(b)–(c),

416.927(b)–(c).[2] In disability claims filed before March 27, 2017, an ALJ must give special consideration to medical opinions from a claimant's treating physician.[3] Specifically, an ALJ must give controlling weight to a treating physician's opinion regarding the nature and severity of a claimant's condition or RFC if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record[.]" 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (same); *see also Gentry*, 741 F.3d at 727 (holding that "[t]he treating physician rule also applies to the RFC of the claimant"). The rationale behind the rule is that a treating source's opinion is most likely "to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

A finding that a treating physician's opinion is not entitled to controlling weight—either because it is not well-supported by medically acceptable evidence and techniques or because it is inconsistent with the substantial evidence in the record—does not mean that the opinion should be rejected entirely. "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). In weighing a non-controlling treating physician's

---

[2] Medical opinions are defined as "statements from acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [his or her] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [any] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1).

[3] A treating physician is an "acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).

opinion, the ALJ must consider the length of the treatment relationship and frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record, the specialization of the treating source, and any other relevant factors. *Gentry*, 741 F.3d at 727 (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)); 20 C.F.R. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6). "The ALJ need not perform an exhaustive, step-by-step analysis of each factor; she need only provide 'good reasons' for both her decision not to afford the physician's opinion controlling weight and for her ultimate weighing of the opinion." *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 785 (6th Cir. 2017), *aff'd sub nom. Biestek v. Berryhill*, 139 S. Ct. 1148 (2019). Such reasons must be "supported by the evidence in the case record[ ] and . . . sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5.

**2. Dr. Carlton's Opinions**

The ALJ found, and the record substantially supports, that Dr. Carlton was Burnett's primary care provider. (AR 26.) The record contains three opinions from Carlton: (1) a medical source statement regarding Burnett's mental health completed and signed by Carlton in February 2017 (AR 449–51); (2) a medical source statement regarding Burnett's mental health completed by therapist Tommy K. Hindman, MA, MFT, and signed by Hindman and Carlton in April 2017[4]

[4] The ALJ treated this opinion as belonging to Carlton (AR 27), and the Commissioner has not argued that the treating physician rule does not apply to this opinion. *See Dyer v. Comm'r of Soc. Sec.*, Civ. Action No. 16-cv-00067, 2018 WL 2445084, at *7 (M.D. Tenn. May 31, 2018) ("Several courts have concluded that where a licensed social worker or other unacceptable medical source is working as part of a treatment team and an acceptable medical source has 'signed off' on the opinions, they should be evaluated as treating physician opinions."), *report and recommendation adopted by* 2018 WL 3609520 (M.D. Tenn. July 27, 2018); *Toro v. Comm'r of Soc. Sec.*, No. 1:15 CV 2220, 2017 WL 413939, at *4 (N.D. Ohio Jan. 31, 2017) ("[C]ourts recognize that a functional opinion prepared by a non-physician member of the treatment team but later signed by the physician, is considered to be the view of the physician as an acceptable treating

(AR 458–60); and (3) a medical source statement regarding Burnett's physical health completed and signed by Carlton in April 2017 (AR 462–63).

Carlton's February 2017 opinion states that she treats Burnett for anxiety and depression, among other conditions. (AR 449.) Asked if Burnett could "reasonably be expected to work an 8 hour day, 40 hour work week, on a regular basis, without missing more than 2 days a month due to [his] disabilities[,]" Carlton checked a box marked "YES" and wrote "if stress controlled[.]" (*Id.*) Asked if Burnett, when "placed into a full time Employment setting, would . . . decompensate and/or have increased psychological symptoms . . .[,]" Carlton wrote "depends on stress level[.]" (*Id.*) Asked about Burnett's limitations in a full-time employment setting, Carlton reported "marked" limitations in Burnett's abilities to: "understand and remember detailed instructions[;]" "carry out detailed instructions[;]" and "maintain attention and concentration for extended periods." (AR 450.) She reported "moderate" limitations of Burnett's abilities to: "work in coordination with or proximity to others without being distracted by them[;]" "travel in unfamiliar places or use public transportation[;]" and "tolerate normal levels of stress[.]" (AR 450–51.) Carlton found "mild" limitations of Burnett's abilities to: "understand and remember very short simple instructions[;]" "perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances[;]" "sustain an ordinary routine without special supervision[;]" "make simple work-related decisions[;]" "complete a normal workday and workweek without interruptions from psychologically based symptoms and . . . perform at a

---

source, in that [s]he is deemed to have 'adopted' as h[er] own a report that may have been prepared by an otherwise non-acceptable source."); *Robinson v. Comm'r of Soc. Sec.*, No. 2:14-cv-01682, 2015 WL 5768483, at *3 (S.D. Ohio Sept. 30, 2015) (finding that, for purposes of the treating physician rule, the SSA "does not distinguish between opinions filled out and signed by a treating [physician] and opinions filled out by a [therapist] and then signed—thus adopted—by a treating [physician]" (citing SSR 96-2p, 1996 WL 374188, at *2)).

consistent pace without an unreasonable number of rest periods[;]" "interact appropriately with the general public[;]" "get along with coworkers or peers without distracting them or exhibiting behavioral extremes[;]" and "respond appropriately to changes in the work setting." (AR 450.)

Carlton and Hindman's April 2017 mental health opinion, which uses the same form, states that they treat Burnett for mental health conditions including severe major depressive disorder, panic disorder, obsessive compulsive disorder, PTSD, and ADHD. (AR 458.) Asked if Burnett could reasonably be expected to work full time on a regular basis without missing more than two days a month due to his disabilities, Carlton and Hindman checked a box marked "NO" and wrote that Burnett's "presenting depression and anxiety is debilitating and occurring in rapid cycles." (*Id.*) They explained that Burnett's "[a]nxiety leads to random panic attacks that cause [him] to decompensate and shut down . . ." and that his "[d]epressive cycles last[ ] 3–5 days." (*Id.*) Asked if Burnett would decompensate or have increased symptoms in a full-time employment setting, Carlton and Hindman wrote: "Yes, undoubtedly. [Burnett's] anxiety very much stems from a place of both performance and social [sic]. [His] interpersonal issues are so much embedded that [in] ANY situation involving the completion of supervised tasks, [Burnett] will shut down and decompensate which leads to the rapid cycling . . . ." (*Id.*) Asked what percentage of time in an average workday Burnett would "be off task due to [his] condition[,]" Carlton and Hindman checked a box marked "60%[.]" (*Id.*) Carlton and Hindman reported "extreme" limitation of Burnett's "ability to complete a normal workday and work week without interruptions from psychologically based symptoms and . . . perform at a consistent pace without an unreasonable number of rest periods." (AR 459.) They found "marked" to "extreme" limitation of Burnett's "ability to respond appropriately to changes in the work setting" and "marked" limitations of his abilities to: "maintain attention and concentration for extended periods[;]" "perform activities

within a schedule, maintain regular attendance and be punctual within customary tolerances[;]" "work in coordination with or proximity to others without being distracted by them[;]" "make simple work-related decisions[;]" "ask simple questions or request assistance[;]" "accept instructions and respond appropriately to criticism from supervisors[;]" "get along with coworkers or peers without distracting them or exhibiting behavioral extremes[;]" "maintain socially appropriate behavior and . . . adhere to basic standards of neatness and cleanliness[;]" "travel in unfamiliar places or use public transportation[;]" and "tolerate normal levels of stress[.]" (AR 459–60.) Carlton and Hindman reported "moderate" limitations of Burnett's abilities to: "understand and remember detailed instructions[;]" "carry out very short and simple instructions[;]" "carry out detailed instructions[;]" "sustain an ordinary routine without special supervision[;]" and "interact appropriately with the general public[.]" (AR 459.) They found "mild" limitations of his abilities to: "remember locations and work-like procedures[;]" "understand and remember very short simple instructions[;]" and "be aware of normal hazards and take appropriate precautions[.]" (AR 459–60.)

Carlton's April 2017 medical source statement regarding Burnett's physical health states that Burnett "has terrible [a]nxiety [and] depression [with] [p]anic [disorder.]" (AR 462.) Asked how many days per month out of a forty-hour work week Burnett would miss because of his medical conditions, Carlton checked a box marked "3" and wrote "depending on severity of anxiety[.]" (*Id.*) She indicated that Burnett had "a reasonable medical need to lie down due to pain, fatigue, or other impairment" and stated that the frequency and duration of this need would "depend[ ] on severity[.]" (AR 463.) Carlton also indicated that Burnett would "need to take unscheduled break periods during an 8 hour work day beyond the normal 15 minute break twice per day and lunch break[.]" (*Id.*)

### 3. The ALJ's Analysis of Dr. Carlton's Opinions

The ALJ analyzed Dr. Carlton's opinions as follows:

> I have considered the mental medical source statements provided by the claimant's primary care provider, Stac[e]y Carlton, M.D. Dr. Carlton opined that the claimant could not be reasonably expected to work an 8 hour day, 40 hour work week, on a regular basis, without missing more than 2 days a month due to his impairments, provided the claimant's stress was controlled. She also opined that the claimant had marked limitations in all areas except understanding and memory (Ex. 6F, 8F). I accord these statements little weight as the claimant's subsequent treatment history, as discussed above, indicates that the claimant did not have marked limitations in any of his areas of functioning. Further, these statements are generally inconsistent with Dr. Carton's findings on examination, as discussed above.
>
> I have also considered the physical medical source statements provided by the claimant's primary care provider Dr. Carlton [and] also accord[ ] it no weight. Dr. Carlton opined that the claimant would miss three days per month due to his anxiety (Ex. 9F at 1). The claimant's subsequent medical evidence of record indicates that his anxiety improved with counseling and treatment and that this is not a valid indication of the claimant's capabilities to perform work related activity. Further, this statement concerning the claimant's physical health seems to primarily concern his mental health and is not very helpful in determining the claimant's physical condition.

(AR 27.)

Burnett has not challenged the ALJ's analysis of Carlton's opinion regarding his physical health. (Doc. No. 20.) He has, however, challenged the ALJ's analysis of Carlton's opinions regarding his mental health. (*Id.*) The Court finds that the ALJ failed to provide good reasons supported by substantial record evidence for discounting Carlton's February 2017 and April 2017 mental health opinions. *See Gentry*, 741 F.3d at 727.

The ALJ's assertion that Burnett's subsequent treatment history does not support Carlton's findings of marked limitations in the full-time employment context is not supported by substantial record evidence. The ALJ's discussion of Burnett's treatment records after April 2017 cites portions of treatment records from Generations Mental Health Center (GMHC) and Burnett's "latest mental status evaluations" from 2018. (AR 26.) The record shows that Burnett sought

treatment at GMHC only for medication management, not counseling, from January 9, 2018, until March 7, 2018. (AR 759–82.) He saw GMHC providers Judy Johnson, LPC-MHSP (AR 759–68), Kaythi Soe, APRN (AR 769–78), and Karyn Harris (AR 779–82).[5] The ALJ cited the mental status assessment checklists and prescriptions in the treatment records from these visits as follows:

> On examination [in early 2018], the claimant had an appropriate appearance and he was oriented to person, place, time, and situation. He had an agitated, depressed, angry, and anxious mood with an appropriate affect. His speech was normal. His thought content included feelings of helplessness as well as racing and obsessive thoughts. He had poor recent memory and good remote memory. His attention and concentration were poor, his impulse control was good, and his judgment and insight were fair (Ex. 14F at 6–7). At that time, the claimant was prescribed Sertraline, Viibryd, Trazodone, Trintellix, Hydroxyzine, Topamax, and Wellbutrin, (Ex. 14F at 18, 25). Later that month, at a follow up appointment, the claimant was oriented to person, place, time, and situation. He had an anxious mood and appropriate affect. His speech was normal. His thought content was normal apart from racing thoughts, and he had fair attention and concentration, impulse control, insight and judgment, and recent and remote memory (Ex. 14F at 18). The following month, the claimant was observed to be oriented to person, place, time, and situation. He had a depressed and anxious mood with appropriate affect. His speech was coherent, his thought content was normal, and he had fair attention and concentration, impulse control, insight and judgment, and recent and remote memory (Ex. 14F at 22). In March 2018, the claimant was observed to be . . . oriented to person, place, time, and situation. He had a euthymic mood with appropriate affect. His speech was coherent, his thought content was clear, and he had fair attention and concentration, impulse control, insight and judgment, and recent and remote memory (Ex. 14F at 25-26).

(AR 26.) These clinical observations do not conflict with Carlton's opinions that a full-time employment setting would significantly increase Burnett's psychological symptoms resulting from his anxiety, depression, and PTSD, causing him to miss more than two days a month and significantly limiting his ability to function in the workplace.

Indeed, the GMHC treatment records identified by the ALJ reflect that Burnett's ongoing struggle with his mental health issues, especially his anxiety, continued to affect his ability to

[5] The administrative record does not specify Harris's credentials (AR 779–82), though pharmacy records show her prescribing medications to Burnett (AR 1107).

function during this period. Johnson's treatment notes from January 9, 2018, state that Burnett "had worked at a few jobs" since he "was 'let go' from" the teaching position he held for ten years, "but he became anxious and could not stay in a position." (AR 766.) Soe's treatment notes from January 25, 2018, state that Burnett was "experiencing social anxiety to the extent that he cannot make himself leave the house due to severe anxiety." (AR 772.) Soe's treatment notes from February 12, 2018, state "that struggling with getting his day started in the morning causes [Burnett] increased anxiety." (AR 776.) Harris's treatment notes from March 7, 2018, reflect that Burnett "[r]eport[ed] depression and anxiety both at 6–7/10 on a 0–10 scale with 10 the worst." (AR 780.)

Further, treatment notes from one of Burnett's therapists, Susan Freitag, LPC, from the same time period show that Burnett consistently reported high anxiety levels, was discussing entering inpatient treatment if his symptoms did not improve, and was experiencing panic attacks. (AR 1013, 1016, 1019.) Burnett also reported feeling guilty for not being able to work, increased depression, and other emotional difficulties. (AR 1019, 1022.) He told Freitag that "[h]e [was] trying to get out of the house more, and this ha[d] possibly increased his anxiety." (AR 1022.)

The ALJ also found that "[t]he latest mental status evaluations, that [Burnett] underwent in 2018, indicated that [he] was oriented to person, place, time, and situation and had an appropriate mood and affect (Ex. 20F at 15, 22)." (AR 26.) These "evaluations" took place in the context of Burnett's visits to the Crossville Medical Group (CMG) for hypertension, hyperlipidemia, depression, and arthralgias on February 1, 2018 (AR 1098–1103), and for back pain and fatigue on March 15, 2018 (AR 1092–97). Contrary to the ALJ's assertion, the treatment records from these appointments do not conflict with Carlton's opinions about Burnett's limited ability to function in the workplace.

Regarding Burnett's depression, the CMG treatment notes from February 1, 2018, state that:

> There is continuation of initial symptoms and worsening of previously reported symptoms. The patient reports functioning as very difficult. The patient presents with anxious/fearful thoughts, compulsive thoughts, depressed mood, difficulty concentrating, difficulty falling asleep, diminished interest or pleasure, excessive worry, racing thoughts and restlessness but denies fatigue. . . . The depression is aggravated by conflict or stress and traumatic memories.

(AR 1098.) The treatment notes from March 15, 2018, reflect that Burnett was exhibiting symptoms of depression (AR 1094), even though the purpose of the visit was treatment for back pain and fatigue, and that the CMG provider "[i]nstructed [Burnett] that [his] fatigue could be due to depression" (AR 1095). The treatment notes further reflect that Burnett was "working with [a] mental health therapist[,] but she primar[il]y focuses on his PTSD and not all his mental health issues as a whole." (AR 1096.) The CMG provider "[d]iscussed possibly getting a second opinion regarding diagnosis and possible treatment options" and planned a "refer[ral] to mental health for further evaluation and treatment." (*Id.*)

The ALJ's only other stated reason for discrediting Carlton's mental health opinions is that her opined limitations "[we]re generally inconsistent with [her] findings on examination, as discussed above." (AR 27.) The ALJ described Carlton's examination findings as follows:

> [Burnett's] mental status evaluations at his primary care provider, which were generally administered by Stacey Carlton, M.D., were also generally routine and benign. The results of these evaluations indicated that the claimant generally, though not exclusively, had a mood and affect that was anxious, depressed and agitated. Otherwise, however, the claimant was generally oriented, with intact associations, judgment and insight, memory, attention and concentration, fund of knowledge, reasoning, computational ability, and thought process and content (Ex. l0F at 12, 17, 25, 29, 37, 46, 50, 54, 108).

(AR 26.) The ALJ's characterization of these cited evaluations, conducted by both Carlton and Hindman, is not substantially supported by the record evidence. Further, the selected clinical examination findings the ALJ cited do not conflict with Carlton's opinion that a full-time

employment setting would cause Burnett to decompensate and shut down, leading to significantly impaired functioning, panic attacks, and depressive episodes lasting three to five days.

Contrary to the ALJ's assertion that Burnett's judgment, insight, memory, attention, concentration, thought process, and thought content were generally intact, Carlton and Hindman's treatment notes identified by the ALJ reflect that:

- On September 7, 2016, Carlton noted that Burnett had recently "had thoughts of suicide" (AR 511);

- On November 9, 2016, Carlton found that Burnett's symptoms included "impaired concentration and memory problems" (AR 496);

- On January 13, 2017, Hindman found that Burnett exhibited attention deficit, impaired cognitive function, inability to concentrate, and intrusive thoughts (AR 488); and

- On February 23, 2017, Hindman found that Burnett exhibited attention deficit, inability to concentrate, passive suicidal ideation, and poor judgment and insight (AR 480).

Moreover, the ALJ did not explain why he plucked these examination findings out of the treatment notes while ignoring other examination findings from the same clinical visits that document Burnett's severe mental health symptoms. For example, on September 7, 2016, after Burnett had been placed on involuntary medical leave from his teaching job and attempted to return, Carlton noted that Burnett "had thoughts of suicide[,]" "fe[lt] like he [was] close to a breakdown[,]" was "considering taking a 4 week break from work (vacation time) to clear his head . . .[,]" was "unsure if he c[ould] return to work at this point due to the stress and concern with his breakdown[,]" and was '[e]xtremely anxious to go to work." (AR 511.) Her plan for treating his anxiety and depression included "add[ing] medication [and] hav[ing] him off of work to adjust[.]" (AR 514.) On October 20, 2016, around the time Burnett was fired from his teaching job after attempting to return, Carlton noted that Burnett was "anxious[,]" "fearful to return to work . . .[,]" and could "not drive to school due to anxiety[.]" (AR 500.) On January 13, 2017, Burnett reported

to Hindman that he quit his most recent counseling job after two months "because he[ ] 'could no longer handle it' and he was experiencing frequent panic attacks due to occupational stressors." (AR 488.) Hindman noted that Burnett's depressive symptoms occurred constantly and "include[d] loss of interest, depressed mood, hopelessness, fatigue, sense of failure, poor concentration, indecisiveness, guilt, poor sleep and headaches"; these symptoms were "exacerbated by . . . job stressors[,]" among other things. (*Id.*) Hindman noted that Burnett's PTSD symptoms occurred frequently and included, among other things, intrusive thoughts, disinterest in life, and inability to concentrate. (*Id.*) On February 23, 2017, Hindman found that—in addition to exhibiting attention deficit, difficulty concentrating, poor insight and judgment, and passive suicidal ideation—Burnett's psychiatric symptoms included anxiety, depression, self-irritation, fearfulness, insomnia, nervousness, and trouble falling asleep. (AR 480.) On April 6, 2017, during an appointment with Carlton for blood in his urine, Burnett's psychiatric symptoms included "Anxiety, Depression, Hypersomnia, Mood changes and Nervousness." (AR 474.) Carlton noted that Burnett was seeing both Hindman and Freitag for therapy and would "most likely take a year off to get [his] anxiety and depression in check." (AR 473.)

The Court therefore finds that the ALJ failed to provide good reasons supported by substantial record evidence for discounting Carlton's opinions regarding Burnett's workplace limitations based on his mental health problems. This failure amounts to a violation of the treating physician rule, *see Gentry*, 741 F.3d at 728 (holding that ALJ's analysis "violate[d] the treating source rule because the reasons for discrediting [the treating source's] opinion are not supported by the record"), and warrants remand regardless of whether the ALJ's denial of benefits may be justified by other evidence in the record, *see Miller*, 811 F.3d at 833.

An ALJ's failure to comply with SSA rules mandates remand unless that failure amounts to "harmless error." *Gentry*, 741 F.3d at 723. The Sixth Circuit has explained that an ALJ's violation of the treating physician rule is only harmless if:

> (1) a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it; (2) if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion; or (3) where the Commissioner has met the goal of [20 C.F.R.] § 1527[(c)](2) . . . even though she has not complied with the terms of the regulation.

*Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011) (quoting *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010)). The Commissioner has not argued that the ALJ's disregard of Carlton's mental health opinions was harmless, and the Court finds that it was not.

First, it cannot be said that Carlton's mental health opinions were patently deficient because the limitations she identified were supported by substantial evidence in the record, including extensive mental health treatment notes encompassing years of therapy and medication management. Second, the ALJ did not adopt Carlton's opinions regarding Burnett's ability to function in a full-time employment setting without regularly missing more than two days per month due to his mental health impairments. Finally, the ALJ's analysis does not meet the goals of 20 C.F.R. §§ 404.1527(c) and 416.927(c) because it "leaves this Court without a clear understanding of why the ALJ" discredited Carlton's opinions. *Cole*, 661 F.3d at 940. As the *Cole* court explained,

> [i]t may be true that, on remand, the Commissioner reaches the same conclusion as to [the claimant's] disability while complying with the treating physician rule and the good reasons requirement; however, [the claimant] will then be able to understand the Commissioner's rationale and the procedure through which the decision was reached.

*Id.* Because Burnett is entitled to this procedural protection, the ALJ's error was not harmless and his case should be remanded. The Court need not consider Burnett's alternative argument that the

ALJ also violated the treating physician rule by giving less weight to Carlton's opinions than to non-treating and non-evaluating sources.

### B. The ALJ's Consideration of Burnett's Subjective Complaints

The ALJ found that Burnett's "subjective complaints are not entirely consistent with the medical evidence and other evidence in the record . . . ." (AR 29.) Burnett argues that this finding is not supported by substantial evidence. (Doc. No. 20.) Because this case should be remanded to the ALJ to reconsider Carlton's mental health opinions and the medical records underlying them, the Court need not address Burnett's argument regarding the ALJ's evaluation of his subjective complaints. The ALJ will no doubt need to reevaluate Burnett's complaints in light of the reconsideration of Carlton's opinions and the medical evidence. If necessary, Burnett may raise this issue again on appeal. *See Dawes v. Saul*, No. 3:19-cv-00001, 2020 WL 587426, at *8 (M.D. Tenn. Feb. 6, 2020), *report and recommendation adopted sub nom. Dawes v. Soc. Sec. Admin.*, 2020 WL 906227 (M.D. Tenn. Feb. 25, 2020); *Wilson v. Colvin*, No. 3:13-CV-84, 2014 WL 619713, at *6 (E.D. Tenn. Feb. 18, 2014).

## IV. Recommendation

For these reasons, the Magistrate Judge RECOMMENDS that Burnett's motion for judgment on the administrative record (Doc. No. 19) be GRANTED, that the ALJ's decision be VACATED, and that this case be REMANDED for further administrative proceedings consistent with this Report and Recommendation.

Any party has fourteen days after being served with this Report and Recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this report and recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

A party who opposes any objections that are filed may file a response within fourteen days after

being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 25th day of February, 2021.

ALISTAIR E. NEWBERN
United States Magistrate Judge